NOT DESIGNATED FOR PUBLICATION

Nos. 117,729
117,730

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
B.C. and J.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Geary District Court; MARITZA SEGARRA, judge. Opinion filed December 29, 2017.
Affirmed.

*Sam S. Kepfield*, of Hutchinson, for appellant.

*Michelle L. Brown*, assistant county attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM: On January 24, 2017, the district court terminated Father's parental
rights to B.C., born in 2011, and J.S., born in 2013, after a three-day termination hearing.
Father appeals, arguing there was insufficient evidence to support the court's finding that
he was unfit under K.S.A. 2016 Supp. 38-2269. Mother separately appealed the
termination of her parent rights, and we have affirmed the district court in *In re A.A.-F.,*
No. 117,368 (this day decided).

Father and Mother are the natural parents of B.C. and J.S. They have another
daughter, E.C., born in 2015, who is not part of this case. Mother also has three minor
children from a previous marriage, A.A.-F., M.A.-F., and F.A.-F. who were the subject of
prior child in need of care (CINC) cases in California in 2009 and 2011. B.C. was born

1

while the 2011 CINC case was ongoing. At the time, Father was incarcerated. B.C. was removed from Mother's custody in December 2011 and placed in foster care.

The current case originated when a petition to remove A.A.-F., M.A.-F., F.A.-F., B.C., and J.S. from the custody of Father and Mother was filed in California in April 2014. The petition was filed in response to reports of inappropriate sexual behavior between A.A.-F., M.A.-F., and B.C. The application concluded that Mother and Father were not adequately supervising the children despite knowledge of A.A.-F.'s and M.A.-F.'s behavior, and all five children should be removed from the home for their own safety. The Superior Court of Los Angeles granted the petition.

On October 8, 2014, Father was arrested in California for domestic battery after an argument with Mother. That same month, while Father was still in jail on that charge, Mother left California with the children and came to Kansas. After being released from jail, Father came to Kansas. On October 29, 2014, Father was arrested in Kansas for criminal threat, battery, and aggravated assault. On November 17, 2014, California issued protective custody warrants for the children, and on December 12, 2014, the children were located in Kansas and returned to California. On June 24, 2015, jurisdiction of the case was transferred to Kansas.

On January 28, 2016, the State of Kansas filed a motion for a finding of unfitness and termination of parental rights, based in part on Father's arrest on July 22, 2015, for criminal threat, domestic battery, and damage to property stemming from an argument with Mother. Substantial testimony regarding the incident was introduced at the termination hearing and will be described below.

The district court held a termination hearing on three different days: September, 22, 2016; November 17, 2016; and January 12, 2017. The district court heard testimony

2

about the criminal charges stemming from Father's actions during the events on October 29, 2014, and July 22, 2015.

On October 29, 2014, police arrested Father in the home of R.W. for aggravated assault, battery, criminal threat, possession of marijuana, and possession of drug paraphernalia. R.W. stated that he and Mother were fellow church members and she had recently returned to Kansas with the children. R.W. allowed Mother and Father to meet at his home so they could try to reconcile their differences. Prior to the meeting, Father told R.W. he had come to get his children back and to reconcile with Mother. Father also told him that he had killed people before who had hurt his family, and he would do bodily harm to anyone who tried to take his children away.

When R.W., Mother, and J.S arrived at the home, Father was already there and asked for J.S. R.W. had entered the home carrying J.S. in a carrier. Father pushed R.W. as he sat J.S.'s carrier down on the couch. R.W. and J.S.'s carrier both fell to the floor.

R.W.'s son, A.W., came into the room and pinned Father to the ground because he had attacked R.W. Father threatened to stab A.W. R.W. stated that Father told them that if they did not allow him to take his children, he would shoot them. A.W. left the room and when he returned, Father was holding J.S., but R.W. was blocking him from leaving. Father threw a punch at R.W. while A.W. was on the phone calling the police.

At the termination hearing, the district court heard testimony from a neighbor who witnessed the events leading up to Father's July 22, 2015 arrest in Kansas. The neighbor testified that he was outside working on his car when he overheard Mother and Father arguing in their driveway on July 22, 2015. According to the neighbor, Mother told Father she had called the police, and Father responded, "Go ahead call the police; it will cost you your life." The argument then moved inside. The neighbor heard crashes and

3

things being moved forcefully inside Mother and Father's home. The neighbor testified he heard yelling coming from inside Mother and Father's home about once a week.

Officer Shawn Weeks of the Junction City Police Department responded to a call regarding the argument. He did not believe any children were there at that time. Mother told Officer Weeks that she had a physical fight with Father, and Father pushed her and choked her. Officer Weeks saw fingernail pressure marks on Mother's throat. Father told Officer Weeks he had an argument with Mother, but he did not know how she got the marks on her throat. Officer Weeks arrested Father for criminal threat, domestic battery, and damage to property because he had broken Mother's phone.

I.A., Mother's nephew, testified he was present for an argument between Mother and Father. He said the argument was only verbal and did not get physical. He heard Father tell Mother, "if you get my kids taken away from me, I will cut you up and throw you in the river."

Several professionals who had worked with the family on the CINC case testified. Lindsey Curtis, the family's case manager from July 2015 until March 2016, testified that Father was incarcerated for almost the entire time she worked on the case. She met with Father in jail to go over case plan tasks and followed up with him several times. She told the court that Father could not do the majority of his case plan tasks while he was in jail. The only exceptions were possibly a domestic violence assessment and a mental health assessment. She reported that Father had taken some parenting classes with Mother before he was incarcerated. She testified that Father wrote letters to his children while he was in jail and sometimes included cartoons he had drawn himself.

Jaclyn Miller took over as case manager after Curtis left in March 2016. Father was incarcerated when she took over, and he had not been able to participate in any case plan tasks. She acknowledged that Father had taken a domestic violence assessment at

some point, but she did not know what the assessment included. Father reported that he had seen a mental health therapist while in county jail, but she could not verify this. Father had since been moved to El Dorado correctional facility, and she did not know what services were available to him there.

Miller stated that Father would have to spend a long time demonstrating he could comply with case plan tasks once he was released before she would consider reintegrating the children with him. This was in part due to concerns she had about domestic violence. Miller said Father had a criminal history dating back to 1991 and had never gone more than five years without committing a new crime. According to Miller, Father would need to acquire appropriate housing and income. He would also need to participate in mental health services, as he had reported a diagnosis of PTSD. He would need to get a domestic violence assessment and follow any recommendations of professionals. She did not think waiting for Father to establish himself after being released was in the children's best interests because they would have to wait on someone else to move forward with their life.

Ophelia Blackwell, a licensed clinical professional counselor, testified Mother and Father had come to her for a court-ordered marital counseling evaluation because of domestic violence in April 2015. They attended three or four sessions, and Father seemed engaged and invested in the marriage. After those sessions, she did not hear from them for a while. She later learned that Father had been arrested. In her opinion, the couple would need to resume marital counseling if Father returned to the home. She would also want Father to receive domestic violence training.

Mary Martinez testified she supervised Father on probation. Father had been sentenced to probation for his 2014 criminal threat charge, with an underlying sentence of 10 months' incarceration. While on probation, he was charged with three new crimes: criminal threat, domestic battery, and three counts of violation of a protection order. His

probation was revoked as a result of the new charges, and the district court ordered him to serve the underlying sentence of 10 months' imprisonment. He was also convicted on all the new charges and sentenced to a total of 18 months' incarceration for those charges.

Mother's mother, B.B., testified she had no concerns about Father's parenting. She said Father had been attentive with E.C. and helped with her day-to-day care. While the couple was living in California, she had seen him prepare meals for the children. He had sought therapy for his children when they started exhibiting sexually inappropriate behavior. She was, however, aware that domestic violence was an issue, because Mother called her whenever it happened. She stated there had been incidents of domestic violence in both California and Kansas.

Mother testified she had meet Father not long after her third child, F.A.-F., was born in 2010. Initially, they were homeless, but they eventually found housing. During the time they were in California, Father was arrested twice. According to Mother, Father was never physically abusive toward the children, and he was a good father. She testified that the only time she had a physical fight with Father while in California was during an argument concerning A.A.-F.'s inappropriate sexual behavior. Father was arrested for domestic violence for the incident.

Mother stated she had been afraid there would be more confrontations with Father once he got out of jail, so she left California with the children in October 2014 and came to Kansas. Mother stayed with the children in Kansas until December 2014, when the children were returned California.

According to Mother, Father was released from jail for the October 29, 2014 incident in January 2015. Father was initially living with a friend, but the couple eventually moved in together. They attended seven or eight parenting classes. They also attended a few counseling sessions together. In July 2015, the children returned to the

6

custody of Kansas. Father only had one visitation, and it was with J.S. only. Father was arrested again in July 2015 for the domestic violence described above. He was incarcerated for the duration of the case.

Father testified he met Mother in 2009 and they married in 2013. When they began dating, Father knew that Mother's children from a previous relationship were already in state custody, and he joined the case plan to help her get her children back. B.C. was born in September 2011, while Mother's other children were still in state custody. California had a case open for B.C. for about six months. The children were eventually reintegrated, and that case was closed.

Father said he and Mother voluntarily continued parenting classes. They also sought therapy for A.A.-F., M.A.-F., and F.A.-F. because they suspected the children had been abused in their foster homes. Father said they opened a new voluntary CINC case because they thought they would have better access to therapy for the children. That case was eventually transferred to Kansas.

Father testified he and Mother argued about how to deal with A.A.-F.'s inappropriate sexual behavior. Father wanted to leave with B.C. and J.S., but Mother called the police to stop him. According to Father, the police told Mother that they could not stop him from leaving with his children, so Mother lied and told the police Father had slapped her. The police then arrested him.

Father testified he learned that Mother had come to Kansas with the children while he was in jail in California. They agreed that he would come to Kansas to pick up her and the children, and they would all return to California. He testified that when he arrived at R.W.'s house, neither she nor the children were there. Mother showed up a few hours later with just J.S. She told Father that her brother and sister would not let her bring the

7

other children. Father said he was frustrated and angry, and he was arrested "as a result of what occurred there."

Father testified he was in jail for about three and a half months after his arrest. The children were taken into custody in Kansas and returned to California. When Father got out of jail in January 2015, he started taking parenting classes and attending couples' therapy with Mother as part of her case plan. He said no one ever went over the case plan with him or gave him case plan tasks at that time.

Father said he pled guilty to criminal threat and was placed on probation. He could not leave Kansas because he was on probation, but he did get travel permits to visit the children in California and attend hearings related to the California CINC case. Before he could have his probation transferred to California, the children were returned to Kansas.

Father said he attended an initial case plan meeting after the children returned to Kansas, but no case plan tasks were established. Soon after the children returned, however, Father was in jail again. Because he was incarcerated, he could not attend case plan meetings, and social workers only came to visit him twice over the course of the case. According to Father, they did not discuss case plan tasks with him.

Father testified the county jail did not offer any services or classes, and he was not in prison long enough to take advantage of the services there. While in jail, he requested a court order to receive therapy at Pawnee Mental Health, which was granted. He had received therapy and took medication for anxiety for about three months. According to Father, the jail just stopped transporting him to Pawnee Mental Health in February 2016. He did not know why.

Father completed a domestic violence assessment as part of his most recent criminal case. The assessment recommended that he take "Batterers' Intervention" but he

had not been able to start that yet. Father denied that he had committed domestic violence "as it was charged," but he admitted there had been domestic violence between him and Mother.

Father testified about his criminal history. He said he was first incarcerated in 1988 at age 18 for theft and served a four-year sentence. He received another four-year sentence for receiving stolen property in 1992. In 1995, he received an eight-year sentence for aggravated burglary. He was incarcerated again in 2003 and 2004. In 2006, he was incarcerated for 32 months. In 2009, he was incarcerated for carrying a concealed weapon. In 2010, he violated his parole and received a one-year sentence. In 2011, he received another two-year sentence for burglary. After that, Father remained out of jail until he was arrested for domestic violence in California in 2014.

Father testified he was willing to complete case plan tasks after he was released from prison. He planned to stay in his friend's unoccupied four-bedroom house in Junction City when he was released. He said he had previously been a superintendent for a construction company in California, and he still had the job. According to Father, the company had jobs all over the country, and he simply needed to have his job transferred to Kansas.

However, Father's testimony was contradicted by the CFO for the construction company. She testified by phone that Father had worked for the company in California from September 2013 until September 2014. She stated Father had worked full-time as a laborer and had never done supervisory work. She testified the company did not have any offices in Kansas and it was not licensed to do construction projects there. She also told the court that Father was not eligible for rehire with the company.

The district court found that both Father and Mother were unfit. The court found a presumption of unfitness under K.S.A. 2016 Supp. 38-2271 applied because the children

9

had been in an out-of-home placement for two years or longer and the parents had failed to carry out a reasonable plan toward reintegration. The court also found the parents unfit under K.S.A. 2016 Supp. 38-2269(b)(5), (b)(7), (b)(8), (b)(9), and (c)(3).

The district court found Father had been incarcerated for almost the entirety of the CINC case and had been unable to complete almost any case plan tasks due to his incarceration. The court noted Father had an extensive criminal history, which indicated he was likely to end up incarcerated again once he was released from his most recent sentence. The court also noted there was a considerable amount of domestic violence in Mother and Father's relationship. Furthermore, Father's testimony about his employment seemed to be untrue. The court found it was in the best interests of the children to terminate both Mother and Father's parental rights. Father appeals.

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2016 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2016 Supp. 38-2269(a).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The Revised Kansas Code for Care of Children provides that the district court may terminate parental rights upon certain findings after a child has been adjudicated a child in need of care. K.S.A. 2016 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2016 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2016 Supp. 38-2269(c). Any one of the factors in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f).

*Presumption of Unfitness*

A district court may also apply a presumption of unfitness under K.S.A. 2016 Supp. 38-2271. K.S.A. 2016 Supp. 38-2271(a)(6) creates a presumption that a parent is unfit

> "by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that: . . . . (A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future."

When the State establishes a presumption of unfitness, the parent must overcome that presumption by showing by a preponderance of the evidence that he or she is a fit parent. *In re X.D.*, 51 Kan. App. 2d 71, 74-75, 340 P.3d 1230 (2014).

Here, the district court found the presumption of unfitness under K.S.A. 2016 Supp. 38-2271(a)(6) applied. Father's only challenge to the presumption is two conclusory sentences at the end of his brief stating he rebutted the presumption. Father

11

has failed to adequately brief this issue, and we deem it waived and abandoned. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011).

*Finding of Unfitness*

In addition to applying the presumption of unfitness, the district court also found Father was unfit under the following factors listed in K.S.A. 2016 Supp. 38-2269: (b)(5) conviction of a felony and imprisonment; (b)(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; and (b)(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. The court also found that the children had been in an extended out-of-home placement and Father had failed to carry out a reasonable reintegration plan. K.S.A. 2016 Supp. 38-2269(b)(9) and (c)(3).

*K.S.A. 2016 Supp. 38-2269(b)(5)—Conviction of a Felony and Imprisonment*

Father challenges the finding that he was unfit under K.S.A. 2016 Supp. 38-2269(b)(5), conviction of a felony and imprisonment. He does not contest that he was convicted of a felony and imprisoned at the time of the hearing. Rather, he argues that there was insufficient evidence to show his condition was unlikely to change in the foreseeable future.

Under K.S.A. 2016 Supp. 38-2269(a), a court must find by clear and convincing evidence that a parent is unfit *and* the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. For purposes of determining whether a parent's unfitness is unlikely to change in the foreseeable future, as required to terminate parental rights, courts determine the foreseeable future from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and children have a right to permanency within a time

12

frame that is reasonable to them. 50 Kan. App. 2d at 1170. This court has previously found that requiring a child to wait more than two years to begin reintegration with a parent was too long. *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001).

Here, B.C. and J.S. had been in out-of-home placement since December 2014. At the time of the termination hearing in late 2016 and early 2017, the children had already been in state custody for two years. As both B.C. and J.S. were no more than five years old, this was a significant portion of their life spent outside of the home.

The district court also noted that Father was incarcerated at the time of the hearing, and jail records indicated he was scheduled to be released in April 2017. Father concedes his scheduled release date was April 19, 2017. This meant the children would have had to wait at least another four months before Father could begin a reintegration plan in earnest. Miller had testified that Father would need to maintain an appropriate environment for the children for a long period before she would consider reintegration as a viable option.

In its ruling from the bench, the district court found: "If [Father's] past behavior is an indication of what his future behavior is . . . he is going to continue this lifestyle, and continue to be incarcerated for substantial periods of time, because that's what's happened until now." A court may predict a parent's future unfitness based on his or her history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Here, Father testified he had a long criminal history dating back to 1988, with prison sentences ranging from one to eight years. Miller also testified that Father had not gone more than five years without committing a new offense. Based on this, a rational factfinder could find it was highly probable that Father would reoffend after his release, and the court did not err in finding so.

Father also highlights in his brief that his convictions arose out of incidents involving the Mother, and the children were not home during two of the domestic violence incidents. However the *In re M.H.* court explained:

> "[T]hough a felony conviction that related to parenting ability might increase the weight the court gives this factor, the court is not required to give Father special consideration just because the felony he committed was unrelated to his parenting skills. In fact, under Kansas law, simply committing a felony and being imprisoned can constitute the sole basis for a finding of unfitness, regardless of the circumstances of the crime. K.S.A. 2013 Supp. 38-2269(b)(5), (f); see *In re M.D.S.*, 16 Kan. App. 2d 505, Syl. ¶ 4, 825 P.2d 1155 (1992). The termination-of-parental-rights statute refers only to felonies generally and doesn't require the crime to be related to parenting to terminate a parent's rights under this basis. K.S.A. 2013 Supp. 38-2269(b)(5), (f)." 50 Kan. App. 2d at 1171-72.

Father had two convictions for criminal threat. Criminal threat is a felony in Kansas. K.S.A. 2016 Supp. 21-5415(c)(1). The district court did not have to consider whether these convictions were related to his parenting skills, because the convictions alone were enough for a finding of unfitness. Nevertheless, J.S. was present during the October 29, 2014 incident. R.W. had testified that J.S. fell to the floor in his carrier after Father pushed R.W. Thus, the circumstances of this crime arguably do implicate Father's ability to parent.

*K.S.A. 2016 Supp. 38-2269(b)(7)—Failure of Reasonable Efforts to Rehabilitate*

Father challenges the district court's finding that he was unfit under K.S.A. 2016 Supp. 38-2269(b)(7), which allows a court to find a parent unfit if reasonable efforts made by appropriate public or private agencies have failed to rehabilitate the family. Father points out that Blackwell testified she planned to provide marital counseling when Father was released in April 2017. Supposing Blackwell's testimony did provide evidence

contrary to the district court's findings that Father was unfit under K.S.A. 2016 Supp. 38-2269(b)(7), it did not undermine the court's findings. As the court explained, Father's "primary hindrance to completing any of [the] assigned tasks is his inability to stay out of jail." Curtis, Miller, and Father all testified there were few tasks he could complete while he was incarcerated. Also, as already discussed, the court found Father's long criminal history indicated there was a high likelihood he would reoffend once released.

*K.S.A. 2016 Supp. 38-2269(b)(8)—Lack of Effort to Change Circumstances*

Father challenges the district court's finding that he was unfit under K.S.A. 2016 Supp. 38-2269(b)(8), which allows a court to find a parent unfit if there is a lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. Specifically, he notes he testified he had a job waiting for him when he got out of jail. Testimony by the construction company's CFO directly controverted Father's testimony regarding his employment. The district court resolved this conflict in evidence in favor of the construction company. As we do not reweigh evidence, Father did not demonstrate he had employment when he was released from jail.

Moreover, the record demonstrates that Father had not made an effort to adjust his circumstances. Father was incarcerated when B.C. was born, and he had been arrested at least three times since then. At least two of those arrests resulted in convictions. Father did not present any evidence of a demonstrable effort to curb his criminal behavior in order to meet B.C. and J.S.'s needs. See *In re M.H.*, 50 Kan. App. 2d at 1173-74 (finding continued criminal behavior supported finding that Father had failed to change his circumstances).

15

*K.S.A. 2016 Supp. 38-2269(b)(9) and (c)(3)*

Father challenges the district court's finding that he was unfit under K.S.A. 2016 Supp. 38-2269(b)(9) and (c)(3). A court may find a parent unfit under K.S.A. 2016 Supp. 38-2269(b)(9) if "the child has been in an extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply." K.S.A. 2016 Supp. 38-2269(c)(3) requires a court to consider if a parent has failed to carry out a reasonable plan approved by the court directed toward integration of the child into the parental home when the child is not in the physical custody of the parent.

Father concedes that B.C. and J.S. had been in an extended out-of-home placement, thus K.S.A. 2016 Supp. 38-2269(b)(9) applied. However, he argues he did not fail to carry out a reasonable plan toward integration. He points out that evidence showed he was willing to participate in case plan tasks such as parenting classes and marital counseling when he was not incarcerated. Because he had been incarcerated during the pendency of much of this case, however, he had been unable to complete any case plan tasks.

Father essentially asks us to view his incarceration as a mitigating factor excusing his failure to complete a reintegration plan. While a district court may view incarceration as a mitigating factor, whether to do so is within the court's discretion. *In re M.H.*, 50 Kan. App. 2d at 1172. Here, the district court chose not to do so for a number of reasons. For one, Father had a long criminal history dating back to 1988. He was incarcerated when B.C. was born in 2011, and he was incarcerated again after committing offenses in 2014 and 2015. Father had spent approximately 20 months in jail or prison during the pendency of this case. This was not a majority of B.C.'s or J.S.'s life, but it was a significant portion given how young they were. Additionally, the children would still have to wait for Father to finish his sentence and complete a case plan before they could

be reintegrated. Looking at his past, there was no guarantee Father would be able to do so before reoffending. Therefore, the district court did not abuse its discretion in treating his incarceration as a negative factor rather than a mitigating one.

Clear and convincing evidence supports that Father was unfit under K.S.A. 2016 Supp. 38-2269(b)(5), (b)(7), (b)(8), and (b)(9). Additionally, the evidence regarding Father's felony conviction and imprisonment alone was likely sufficient to establish grounds for termination of Father's parental rights. The district court did not err in finding that Father was unfit.

*Best Interests of the Child*

Once a district court makes a finding that clear and convincing evidence establishes a parent is unfit, the court then shall consider whether termination of parental rights is in the best interests of the child. K.S.A. 2016 Supp. 38-2269(g)(1). In making this determination, the court gives primary consideration to "the physical, mental and emotional health of the child." K.S.A. 2016 Supp. 38-2269(g)(1). "If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2016 Supp. 38-2269(g)(1).

The district court is in the best position to make findings as to what is in the best interests of the child. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). Therefore, "its judgment will not be disturbed in the absence of an abuse of judicial discretion." 44 Kan. App. 2d at 318. "A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Father does not challenge the district court's best interests finding, so he has waived and abandoned this issue. *Superior Boiler Works, Inc.*, 292 Kan. at 889. Nevertheless, based on the evidence presented, a reasonable person could agree that it was in the best interests of the children to terminate his parental rights. B.C. and J.S. had been in state custody for over two years. Father had a long criminal history, and he had been incarcerated for a significant portion of the case. Mother and Father also had ongoing problems with domestic violence that had yet to be adequately addressed. A reasonable person could agree that terminating Father's parental rights was in the best interests of B.C. and J.S. We affirm the district court.

Affirmed.